**ABBOTT LABORATORIES, an Illinois corporation, Plaintiff–Appellant,**

v.

**ALPHA THERAPEUTIC CORPORATION, a California corporation, and Green Cross Corporation, a Japanese corporation, Defendants–Appellees.**

No. 98–1325.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1998.

Decided Jan. 11, 1999.

Terry M. Grimm (argued), Kimball R. Anderson, Raymond C. Perkins, Anne Davis Cartwright, Winston & Strawn, Chicago, IL, Sharon E. Jones, Abbott Laboratories Office of the General Counsel, Abbott Park, IL, for plaintiff-appellant.

Lindley J. Brenza (argued), Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, for Defendant-Appellee.

Before COFFEY, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Through a lengthy series of negotiations, Alpha Therapeutic and its parent, Green Cross, attempted to amicably settle their contract indemnification claims against Abbott Labs. When the negotiations broke down, Abbott filed this diversity action for declaratory relief, asking the district court to find that two letters between Abbott's lawyer and Alpha's lawyer constituted a binding settlement agreement. The parties filed opposing motions for summary judgment. District Judge Charles P. Korcoras found no binding settlement agreement and granted Alpha's motion for summary judgment. Abbott appeals, and we review the judgment of the district court *de novo*. *Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 181 (7th Cir. 1995).

There is no dispute between Alpha and Abbott about the facts. The case has its roots in Abbott's sale of its scientific products division to Alpha in 1978. The division manufactured and distributed a blood product called "factor concentrate" used to treat hemophiliacs. Abbott agreed to indemnify Alpha for any losses arising from the inventory transferred. As it turned out, Abbott chose a good time to get out of the blood products business. In the 1980's, a class of hemophiliacs who claimed to be infected with HIV through the use of factor concentrate brought suit against members of the blood

products industry including Alpha. Negotiations to create an industry-wide class settlement began, and Alpha commenced negotiating its indemnity claims against Abbott.

On August 9, 1996, after extensive negotiations, Sharon Jones, Abbott senior counsel, wrote to Edward Colton, Alpha general counsel, outlining Abbott's "final settlement offer." In the letter, Ms. Jones named the proposed dollar figure and outlined the "essential terms from Abbott's perspective." These terms included a series of releases that Abbott was seeking in exchange for its settlement payment. Ms. Jones also provided that because "it is Abbott's intention to have no further obligation to Alpha, ... Abbott will be proposing more precise language in the anticipated settlement agreement in order to accomplish this directive." Finally, in response to a request from Alpha, the letter indicated that Abbott would be willing to defer its payment if the parties could agree on an interest rate.

Mr. Colton responded to Ms. Jones in an August 26 letter: "Alpha has agreed to accept Abbott Laboratories' settlement offer of [the proposed settlement amount]. In general, we agreed with the terms and conditions contained in your August 9, 1996 letter." Colton also requested that the settlement agreement be "resolved with respect to all the terms and conditions and ready for execution before September 12th." He wanted to present the agreement as a "done deal" at Alpha's September 13 board meeting because several Green Cross executives from Japan who could "execute the Agreement" would be present at the board meeting. Finally, Colton asked Abbott to defer payment until January 15, 1997, and proposed a 7% interest rate.

Unfortunately, the matter did not come to a satisfactory conclusion as quickly as Colton had hoped. In the following months, the parties continued to negotiate the details of their deal, exchanging and modifying several proposed settlement agreements. On December 9, 1996, Jones sent Colton her final version of the settlement agreement and asked that the agreement be executed by December 11. On January 6, 1997, Colton informed Jones that in light of the uncertainty of the blood products class settlement negotiations, Alpha would not be willing to settle unless Abbott significantly increased the settlement amount. Instead, Abbott decided to sue.

Abbott seeks to enforce an alleged agreement between the parties that requires Alpha to indemnify Abbott indefinitely into the future for all defense costs and losses related to factor concentrate. The Illinois version of the Statute of Frauds requires that all such long-term contractual obligations be "in writing, and signed by the party to be charged." 740 ILCS 80/1 (West 1997). In addition, the original contract for the sale of Abbott's scientific products division to Alpha which created Abbott's indemnification obligations requires that any modifications be in writing. Abbott asserts the two letters exchanged by the parties in August 1996 as the signed writing required by the Statute of Frauds and the original asset sales agreement. Therefore, the sole issue before us is whether those two letters constitute a binding settlement agreement.

■ Local contract law governs the construction and enforcement of settlement agreements. *See Laserage Tech. Corp. v. Laserage Lab., Inc.*, 972 F.2d 799, 802 (7th Cir.1992). Under Illinois contract law, a binding agreement requires a meeting of the minds or mutual assent as to all material terms. *See SBL Assoc. v. Village of Elk Grove*, 247 Ill.App.3d 25, 31, 186 Ill.Dec. 939, 617 N.E.2d 178, 182 (1993). Whether the parties had a "meeting of the minds" is determined not by their actual subjective intent, but by what they expressed to each other in their writings. Thus, the parties decide for themselves whether the results of preliminary negotiations bind them, and they do so through their words. *See Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir.1989) citing *Chicago Inv. Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill.Dec. 869, 481 N.E.2d 712, 715 (1985).

■ Abbott contends that the August letters between Jones and Colton constitute a legally binding offer and acceptance which show the parties' mutual assent to the terms contained in Ms. Jones's letter. That letter,

says Abbott, outlined all the material terms: (1) the settlement amount; (2) a global release by Alpha and Green Cross for all hemophiliac claims; (3) indemnification of defense costs for all such claims; (4) a release of all environmental claims arising from any property sold to Alpha and Green Cross; and (5) a release of any other indemnification claims arising from the 1978 asset sale agreement. Abbott points out that Jones also stated in the letter that this was Abbott's "final settlement offer," expressing her belief that Abbott would be bound by the terms of the offer if Alpha accepted. And, Abbott argues, Colton accepted the offer on behalf of Alpha in his August 26 letter, when he wrote "Alpha has agreed to accept Abbott Laboratories' settlement offer of [the proposed amount]."

Abbott believes that at that moment the settlement was a done deal. And this was the entire deal—none of the terms Ms. Jones listed varied in a material way throughout the exchange of draft settlement documents in the fall of 1996. The parties did not discover some unexpectedly contentious material detail such as deferred payment or interest rates that proved to be the deal breaker. The only reason the deal fell apart was that Alpha decided it wanted more money. Colton received news from the blood product class action settlement negotiations that things were not going well, and a deal with Abbott that looked so good in August looked a lot less attractive in January.

There is superficial appeal to Abbott's argument that it was unfair for Alpha to pull a switcheroo in its position on the proposed settlement amount solely because the class action negotiations were going badly. At the very least, it seems that Alpha had agreed in principle to the dollar figure Ms. Jones proposed in August. This argument breaks down, however, upon examination of the degree to which the parties decided to bind themselves in August. The parties decide for themselves whether preliminary negotiations will bind them, and they do so through their words. See Empro, 870 F.2d at 425. In this case, the words in the two August letters do not show a clear intent to be bound on behalf of either Abbot or Alpha.

■ Ms. Jones wrote in her August 9 letter that she was only reiterating the "general terms" of the proposal currently on the table and attempting to identify the "essential terms from Abbot's perspective." There is a strong implication here that Jones expects Alpha to counter with essential terms of its own that will require further negotiation. She also says she will be proposing more precise language regarding the release terms in the "anticipated settlement agreement." As a general rule, anticipation of a more formal future writing does not nullify an otherwise binding agreement. See Dawson v. General Motors Corp., 977 F.2d 369, 374 (7th Cir.1992). Here, however, Jones explicitly leaves the details of the release provisions open for future negotiation, and terms of this sort in settlement agreements are inherently material. See Trendmasters, Inc. v. Walgreen Co., 1996 WL 422273 (N.D.Ill.). The fact that Jones left the details of a material term open to negotiation calls into question Abbott's intent to be bound at that time.

Similarly, Colton's August 26 letter does not sufficiently express an intent to be bound to Jones's terms. In the sentence immediately following the one where he agreed to the proposed dollar figure, Colton wrote that Alpha agreed to the terms in the August 9 letter "in general." He also wrote that he wanted "the Agreement resolved with respect to all terms and conditions and ready for execution before September 12." That date was significant because Alpha had a board meeting scheduled for September 13, and certain Green Cross executives who could "execute the Agreement" would be present. Therefore, he wanted to be able to present the settlement as a "done deal." All of this language strongly implies that Colton did not yet consider the settlement a "done deal." Instead, he understood that certain terms would have to be hammered out before the executives signed off on the deal.

Abbott argues that informal writings between parties can constitute a binding settlement agreement unless the parties decide to expressly condition their deal on the signing of a formal document. See Empro, 870 F.2d at 425. This is an accurate statement of the

rule, but informal writings must still manifest each party's intent to be bound by the material terms proposed. It is true, as Abbott's counsel pointed out at argument, that Colton did not make the deal expressly conditional on a signed writing. But this argument puts the cart before the horse. Colton did not clearly express a desire to bind Alpha to Jones's terms in the first place, so there was no need for him to expressly condition the deal on execution of a final written agreement.

The settlement that Alpha and Abbott were trying to hammer out was a complicated, long-term arrangement involving huge sums of money. Although there is no requirement that an agreement, even a big one, be "signed, sealed, and delivered" to be binding, the magnitude of a deal requires careful scrutiny of any claim that informal letters in the course of freewheeling settlement negotiations constitute a binding agreement. To be binding, such letters must clearly manifest the desire of each party to be bound to the material terms of the proposed deal. Agreement "in general" with a clear contemplation that further negotiations as to material terms will be required is simply not enough to form ties that bind. Therefore, we find that there was no binding settlement agreement between Abbott and Alpha. The district court's grant of summary judgment in favor of Alpha is AFFIRMED.