JOHN J. KUBICEK ET AL., APPELLEES, v. EDWARD M. KUBICEK ET AL., APPELLANTS.

186 N. W. 2d 923

Filed May 7, 1971. No. 37787.

Gerald J. Hallstead, for appellants.

Jack L. Craven, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SPENCER, J.

Defendants, Edward M. and Frank R. Kubicek, appeal from the granting of partition of 268¼ acres of land in Saline County, Nebraska, and the dismissal of their cross-petition for specific performance of an alleged agreement for voluntary partition. Plaintiffs are John J. Kubicek, a brother of the defendants, and his wife. The parties will be hereinafter referred to by their Christian names. Frank owns an undivided one-half interest, and John and Edward each an undivided one-fourth interest in the land in question. We affirm.

A part of the land has been the Kubicek home since 1881. It was inherited from their father by the three brothers and by another brother, Charles, who sold his undivided one-fourth interest to Frank before the filing of this action. The property was subject to a life estate in the mother who had just died, and to certain payments to other heirs.

On September 24, 1967, shortly after the mother's death, the Kubicek heirs met at the mother's former residence in Crete, Nebraska, to dispose of the personal property of the estate amongst themselves. The four brothers then went to the basement to see if it was possible to work out an amicable agreement to divide the

property so as to keep it in the Kubicek family. The family relationships had always been amicable. The three involved herein had often exchanged work, and jointly owned farm machinery.

Testimony on behalf of the defendants would indicate that Charles, who did not farm, and Edward, who owned his own land, were interested in selling their undivided interest in the land to Frank and John who farmed the land. John lived on the premises and farmed 121 acres. According to defendants' evidence, John was to take 100 acres which was to be the 80 on which he lived and 20 acres adjoining it on the southeast. Frank would take the rest. In order to arrive at the value of the land, the brothers used an estate inheritance tax appraisal, but slightly increased the value of a portion of it. On this occasion, Charles made a record of suggested values on a page in the notebook which had been used by the family in the distribution of the personal property. This is the only memorandum of the transaction and consists entirely of mathematical figures, a few letters, and the initials of the four brothers. It is as follows:

```
40A - at 200      8000
88A - at 165     14520
60A - at 242     14520
80A - at 220₂    17600
        J      3  4,640
   17600          22,520
    4840           9680
   22,440        32,200

  220      220 10%    242
   60                  60
  13200      22      14520

  200       242       242
   10        40        20
  220      9,680      4840
   80         OK, CJ.K.
  17600  OK, Ed.J.K.
   JJK.        SRK.
```

John contends no agreement was reached as to exactly what land he was to receive on September 24, 1967. He contends the agreement was a preliminary one and the parties were to meet in the law office of defendants' counsel to see if they could work out an agreement. John's testimony is corroborated in part by Charles, who testified he did not hear any such discussion nor did he have any conversation with John as to what part of the land John wanted if there was a division.

The following testimony by Frank would indicate that the parties expected to finalize an agreement at the subsequent meeting in the attorney's office: "A Well, on that September 24th we was all there we was going to meet the following Saturday at Hallstead's in Crete to come up with the division and if Hallstead couldn't make it John told Charles J. he'd call him up and tell him which Saturday to appear so it wouldn't interfere with his work at Havelock shop. * * * Q And what then occurred between the four of you? A Well, we met with Hallstead * * * A Well, we came to Hallstead's office and we went to the room up there, sit down to the table, start visiting, and I says, Hallstead's got other work to do we should get on to business. Well, now, how are we going to arrive from where, and I pulled out this book and handed over on Hallstead's desk and I said, we can start from here, and that's where John stood up and he says, 'I ain't going to go along,' and he took off. We followed and had a talk up there and each went off by our own way." The parties met later but could not arrive at an agreement, and several months later Charles sold his undivided interest in the farm to Frank.

The question presented is whether the memorandum is sufficient to comply with section 36-105, R. R. S. 1943, which is as follows: "Every contract for the leasing for a longer period than one year, or for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party by whom the lease or sale is to be made."

In Barkhurst v. Nevins, 106 Neb. 33, 182 N. W. 563, we said with respect to the statute: "This section of the statute clearly contemplates that the contract, or note, or memorandum thereof in writing, shall contain within itself all of the essential elements which go to make up a contract, and, when essential elements of the contract are lacking, the contract must fail, because essential elements cannot be supplied by parol testimony. * * * The very purpose of the statute was to prevent such contracts from resting in parol."

The figures appearing on the memorandum with the letter "A" can be interpreted to refer to acres, and when these figures are added together, they total 268 acres. The figures following the preposition "at" could readily be interpeted to show a value set on that particular area. The initials obviously can be interpreted to refer to the brothers. Everything else essential to the agreement, however, must be supplied by parol.

Assuming that "J" and "F" refer to John and Frank, exactly what property are they taking? There is no legal description for any of it. John was actually farming 121 acres. The memorandum obviously does not point out which 100 acres he would take. Edward testified that subsequent to September 24, 1967, John wanted all the land north of the road, or approximately 140 acres. What are the terms of sale if John and Frank are the buyers? Did John and Frank actually agree to buy the property? There is an "O.K." preceding the initials of Charles and Edward who according to the testimony would be selling their undivided interests, but none before those of John and Frank. Was the memorandum intended as an agreement to purchase, or was it merely an offer by Charles and Edward who are the only two to initial the letters "O.K."? Or is the memorandum merely an indication by Charles and Edward of their willingness to sell their undivided interest in the property which was to be effectuated by a further agreement at a subsequent meeting to be held

in the attorney's office? These are essential elements and if the statute means what it says should be covered in some manner by the memorandum.

In Mercer v. Payne & Sons Co., 115 Neb. 420, 213 N. W. 813, we said: "A court of equity will not enforce a contract, unless it is complete and certain in all its essential elements. The parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms, the case is not one for specific performance. It is not the function of a court of equity to make a contract for the parties, or to supply any of the material stipulations thereof."

Defendants cite Ruzicka v. Hotovy, 72 Neb. 589, 101 N. W. 328, to support their position on the sufficiency of the memorandum. That case is of no help to the defendants. The land in that case was sufficiently described by the memorandum. It was described as "¼ Sc. 7, T. 13, R. 4." The vendor owned only the southeast quarter in the described section so no other land could have been intended, and the purchase price and the terms were stated in the memorandum. That case was overruled by Heine v. Fleischer, 184 Neb. 379, 167 N. W. 2d 572, to the extent that it was in conflict with that opinion. To the extent that Ruzicka inferred that all material terms of the contract need not appear in the memorandum, it has previously been impliedly overruled by subsequent cases. The following from Heine leaves no doubt on that point: "The memorandum required by the statute of frauds must contain the essential terms of the contract. Ord v. Benson, 163 Neb. 367, 79 N. W. 2d 713; Restatement, Contracts, § 207, p. 278."

While the briefs of the parties ignore the fact, we do observe that John's wife is a party plaintiff herein. While her interest is only that of a spouse, by virtue of that relationship she does have a marital interest in an undivided one-fourth of the 268¼ acres. She did not

participate in the alleged agreement. in any manner.

We hold the memorandum is insufficient and the agreement claimed by defendants is within the inhibition of the statute of frauds. This holding obviates any necessity to discuss other issues raised by the defendants.

The judgment is affirmed.

AFFIRMED.