EMPRO MANUFACTURING CO., INC., Plaintiff–Appellant,

v.

BALL–CO MANUFACTURING, INC., et al., Defendants–Appellees.

No. 88–2480.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1989.

Decided March 16, 1989.

---

Thomas P. Luning, Schiff Hardin & Waite, Chicago, Ill., for plaintiff-appellant.

John L. Hines, Jr., Tuite, Mejia & Giacchetti, Chicago, Ill., for defendants-appellees.

Before EASTERBROOK, RIPPLE, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

We have a pattern common in commercial life. Two firms reach concord on the general terms of their transaction. They sign a document, captioned "agreement in principle" or "letter of intent", memorializing these terms but anticipating further negotiations and decisions—an appraisal of the assets, the clearing of a title, the list is endless. One of these terms proves divisive, and the deal collapses. The party that perceives itself the loser then claims that the preliminary document has legal force independent of the definitive contract. Ours is such a dispute.

Ball–Co Manufacturing, a maker of specialty valve components, floated its assets on the market. Empro Manufacturing showed interest. After some preliminary negotiations, Empro sent Ball–Co a three-page "letter of intent" to purchase the assets of Ball–Co and S.B. Leasing, a partnership holding title to the land under Ball–Co's plant. Empro proposed a price of $2.4 million, with $650,000 to be paid on closing and a 10–year promissory note for the remainder, the note to be secured by the "inventory and equipment of Ballco." The letter stated "[t]he general terms and conditions of such proposal (which will be subject to and incorporated in a formal, definitive Asset Purchase Agreement signed by both parties)". Just in case Ball–Co might suppose that Empro had committed itself to buy the assets, paragraph four of the letter stated that "Empro's purchase shall be subject to the satisfaction of certain conditions precedent to closing including, but not limited to" the definitive Asset Purchase Agreement and, among five other conditions, "[t]he approval of the shareholders and board of directors of Empro".

Although Empro left itself escape hatches, as things turned out Ball–Co was the one who balked. The parties signed the letter of intent in November 1987 and negotiated through March 1988 about many terms. Security for the note proved to be the sticking point. Ball–Co wanted a security interest in the land under the plant; Empro refused to yield.

When Empro learned that Ball–Co was negotiating with someone else, it filed this diversity suit. Contending that the letter of intent obliges Ball–Co to sell only to it, Empro asked for a temporary restraining order. The district judge set the case for a prompt hearing and, after getting a look at the letter of intent, dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted. Relying on *Interway, Inc. v. Alagna*, 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 407 N.E. 2d 615 (1st Dist.1980), the district judge concluded that the statement, appearing twice in the letter, that the agreement is "subject to" the execution of a definitive contract meant that the letter has no independent force.

Empro insists on appeal that the binding effect of a document depends on the parties' intent, which means that the

case may not be dismissed—for Empro says that the parties intended to be bound, a factual issue. Empro treats "intent to be bound" as a matter of the parties' states of mind, but if intent were wholly subjective there would be no parol evidence rule, no contract case could be decided without a jury trial, and no one could know the effect of a commercial transaction until years after the documents were inked. That would be a devastating blow to business. Contract law gives effect to the parties' wishes, but they must express these openly. Put differently, "intent" in contract law is objective rather than subjective—a point *Interway* makes by holding that as a matter of law parties who make their pact "subject to" a later definitive agreement have manifested an (objective) intent not to be bound, which under the parol evidence rule becomes the definitive intent even if one party later says that the true intent was different. As the Supreme Court of Illinois said in *Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 364, 247 N.E.2d 886, 888 (1969), "intent must be determined solely from the language used when no ambiguity in its terms exists". See also *Feldman v. Allegheny International, Inc.*, 850 F.2d 1217 (7th Cir.1988) (Illinois law); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814–17 (7th Cir.1987) (New York and Wisconsin law). Parties may decide for themselves whether the results of preliminary negotiations bind them, *Chicago Investment Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill.Dec. 869, 871, 481 N.E.2d 712, 715 (1985), but they do this through their words.

Because letters of intent are written without the care that will be lavished on the definitive agreement, it may be a bit much to put dispositive weight on "subject to" in every case, and we do not read *Interway* as giving these the status of magic words. They might have been used carelessly, and if the full agreement showed that the formal contract was to be nothing but a memorial of an agreement already reached, the letter of intent would be enforceable. *Borg–Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 156 N.E.2d 513 (1958). Conversely, Empro can-

not claim comfort from the fact that the letter of intent does not contain a flat disclaimer, such as the one in *Feldman* pronouncing that the letter creates no obligations at all. The text and structure of the letter—the objective manifestations of intent—might show that the parties agreed to bind themselves to some extent immediately. *Borg–Warner* is such a case. One party issued an option, which called itself "firm and binding"; the other party accepted; the court found this a binding contract even though some terms remained open. After all, an option to purchase is nothing if not binding in advance of the definitive contract. The parties to *Borg–Warner* conceded that the option and acceptance usually would bind; the only argument in the case concerned whether the open terms were so important that a contract could not arise even if the parties wished to be bound, a subject that divided the court. See 156 N.E.2d at 930–36 (Schaefer, J., dissenting).

A canvass of the terms of the letter Empro sent does not assist it, however. "Subject to" a definitive agreement appears twice. The letter also recites, twice, that it contains the "general terms and conditions", implying that each side retained the right to make (and stand on) additional demands. Empro insulated itself from binding effect by listing, among the conditions to which the deal was "subject", the "approval of the shareholders and board of directors of Empro". The board could veto a deal negotiated by the firm's agents for a reason such as the belief that Ball–Co had been offered too much (otherwise the officers, not the board, would be the firm's final decision-makers, yet state law vests major decisions in the board). The shareholders could decline to give their assent for any reason (such as distrust of new business ventures) and could not even be required to look at the documents, let alone consider the merits of the deal. See Earl Sneed, *The Shareholder May Vote As He Pleases: Theory and Fact*, 22 U.Pittsburgh L.Rev. 23, 31–36, 40–42 (1960) (collecting cases). Empro even took care to require the return of its

$5,000 in earnest money "without set off, in the event this transaction is not closed", although the seller usually gets to keep the earnest money if the buyer changes its mind. So Empro made clear that it was free to walk.

■ Neither the text nor the structure of the letter suggests that it was to be a one-sided commitment, an option in Empro's favor binding only Ball–Co. From the beginning Ball–Co assumed that it could negotiate terms in addition to, or different from, those in the letter of intent. The cover letter from Ball–Co's lawyer returning the signed letter of intent to Empro stated that the "terms and conditions are generally acceptable" but that "some clarifications are needed in Paragraph 3(c) (last sentence)", the provision concerning Ball–Co's security interest. "Some clarifications are needed" is an ominous noise in a negotiation, foreboding many a stalemate. Although we do not know what "clarifications" counsel had in mind, the specifics are not important. It is enough that even on signing the letter of intent Ball–Co proposed to change the bargain, conduct consistent with the purport of the letter's text and structure.

The shoals that wrecked this deal are common hazards in business negotiations. Letters of intent and agreements in principle often, and here, do no more than set the stage for negotiations on details. Sometimes the details can be ironed out; sometimes they can't. Illinois, as *Chicago Investment, Interway,* and *Feldman* show, allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics. Approaching agreement by stages is a valuable method of doing business. So long as Illinois preserves the availability of this device, a federal court in a diversity case must send the disappointed party home empty-handed. Empro claims that it is entitled at least to recover its "reliance expenditures", but the only expenditures it has identified are those normally associated with pre-contractual efforts: its complaint mentions the expenses

"in negotiating with defendants, in investigating and reviewing defendants' business, and in preparing to acquire defendants' business." Outlays of this sort cannot bind the other side any more than paying an expert to tell you whether the painting at the auction is a genuine Rembrandt compels the auctioneer to accept your bid.

AFFIRMED.