# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2936

_____

Diesel Power Equipment, Inc., a    *
Nebraska Corporation,    *
   *
       Appellee,    *     Appeal from the United States
   *     District Court for the
    v.    *     District of Nebraska.
   *
ADDCO, Inc., a Minnesota    *          [PUBLISHED]
Corporation,    *
   *
       Appellant.    *

_____

Submitted: April 12, 2004
Filed: July 26, 2004

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following a bench trial, the district court awarded $809,396 to Diesel Power Equipment, Inc. (Diesel Power) in its breach-of-contract claim against ADDCO, Inc., and ADDCO appeals. Because the parties' agreements were not sufficiently definite to form a binding contract under Nebraska law, we reverse the district court's judgment.

## I.

Diesel Power is a Deutz engine distributor based in Omaha, Nebraska, whose distributorship covered Nebraska, Iowa, Missouri, Illinois, Indiana, parts of Kansas, and most of Kentucky. ADDCO is a Minnesota company that owned a division called the Nicholson Engine Group (NEG), which primarily engaged in the sale and distribution of Deutz engines and products in Minnesota, South Dakota, North Dakota, and parts of Wisconsin. This case involves Diesel Power's failed attempt to purchase NEG from ADDCO.

Diesel Power's owner, Bill Engler, began negotiating the purchase of the NEG division with Tim Nicholson, ADDCO's president, in early 2001. Engler and his business consultant, Morley Zipursky, met with Nicholson several times over the summer and Engler sent a preliminary offer letter to Nicholson on August 24, 2001, detailing values for the inventory, fixed assets, and furniture that Diesel Power was interested in purchasing. The letter stated that it was not the entire offer and listed goodwill, consulting, and noncompete payments, as well as other elements, as items that needed to be discussed. The parties met on August 30 to finalize specific inventory and fixed-asset items to be included in the purchase. Engler offered $275,000 for goodwill, or $350,000 to be paid in installments, and Nicholson indicated he wanted more money for goodwill. Engler agreed to draft a joint letter to be sent to Deutz for its approval of the sale. The men discussed closing the sale in October or November 2001.

The next day, Nicholson called Engler and stated that he accepted the offer, and Engler agreed to draft a letter of intent. Zipursky drafted a proposed letter of intent, which specified amounts for various assets and discussed how to handle the purchase of accounts receivables. The letter of intent offered to pay for goodwill in one of two ways: either $275,000 paid at closing, or $100,000 at closing with five annual installments of $50,000 for a total of $350,000. Zipursky forwarded the letter of

2

intent to Nicholson on September 4. Nicholson responded that one item was missing from the list of fixed assets and that one amount was not as agreed. Zipursky forwarded a revised letter of intent correcting these items on September 6. After reviewing the revised letter of intent, Nicholson called Zipursky and discussed changing the goodwill price to $350,000 due in full at closing. Engler offered to pay $300,000 at closing and $25,000 per year over the next two years. Nicholson responded "we've got a deal."

A third revised letter of intent was forwarded to Nicholson on September 11, which Nicholson signed. The total purchase price contemplated in the Letter of Intent was $1,290,400. The Letter of Intent stated that closing "will depend on when we get the agreements in place" and assured ADDCO that Diesel Power's "efforts should we be successful in purchasing the NEG company will [in] no way have a diliterious [sic] affect [sic] on your reputation." (Appellant's App. at 92.) Nicholson also signed the joint letter to Deutz, which stated that Diesel Power had "agreed in principle" to buy NEG from ADDCO and requested Deutz's approval of the transfer of the distributorship. On September 18, Deutz sent a letter to both parties stating it approved of the sale with the conditions that Diesel Power maintain a facility in the Minneapolis area, Diesel Power comply with its distributorship contract, there be a separate contract for the NEG territory, and the accounts of both Diesel Power and NEG be brought current.

Zipursky prepared a draft Asset Purchase Agreement and forwarded it to Nicholson on September 27. The draft agreement contained terms similar to the September 11 Letter of Intent, with the addition of closing procedures and other miscellaneous provisions. Nicholson asked that various prices be shifted between the goodwill figure and the other assets. A second draft Asset Purchase Agreement was forwarded on October 24. The October 24 agreement varied from the September 27 draft in the following respects: the October 24 agreement allocated $180,000 toward the Deutz distributorship, whereas the September 27 agreement placed no value on

the distributorship; the October 24 agreement provided for a noncompete agreement for the three principals of ADDCO and allocated $50,000 (payable in two installments of $25,000 over a two-year period) toward the value of the noncompete, whereas the September 27 agreement did not mention a noncompete agreement; the October 24 agreement made no mention of a goodwill payment, whereas the September 27 agreement allocated $350,000 to goodwill, to be paid $300,000 at closing and two $25,000 annual payments; and the October 24 agreement allocated full value to the inventory, whereas the September 27 agreement discounted older inventory. Neither of the draft Asset Purchase Agreements was ever signed.

In late October 2001, Interstate Companies, Inc., which had attempted to purchase the NEG division in 1999, contacted Nicholson about buying NEG. Nicholson sought and received approval from Deutz to sell NEG to Interstate. On November 6, Nicholson informed Engler that he had another offer that was $1 million higher and asked Engler if he would increase his offer. Engler tried to enforce the Letter of Intent, but ADDCO subsequently entered an Asset Purchase Agreement with Interstate on November 20 for a total price of $2,181,896, and the sale closed on November 30.

Diesel Power sued ADDCO for breach of contract. In a trial to the bench, the district court determined that the parties entered an oral agreement on August 31, which was memorialized by the September 11 Letter of Intent. The court found that the commitments and agreements were certain and definite and that the parties' conduct evinced an objective intent to be bound by the terms of the Letter of Intent. The court found that the October 24 draft Asset Purchase Agreement did not materially alter the terms of the September 11 Letter of Intent, concluding that any terms referred to in the draft Asset Purchase Agreement but not in the Letter of Intent were either implied in the Letter of Intent, were not essential to the agreement, or were reallocated at Nicholson's request for purposes of maximizing tax benefits.

4

The court found that ADDCO breached the contract by selling NEG to Interstate and assessed Diesel Power's damages at the difference between the sale price to Interstate and the contract price specified in the September 11 Letter of Intent, with adjustments for a few minor differences between the property included in the Interstate sale and that contemplated by the Letter of Intent. The court also reduced the damage award by $50,000, the amount that ADDCO disputedly owed to Deutz to bring its account current, to avoid having to deal with any issues arising out of Deutz's September 18 condition that both ADDCO and Diesel Power bring their accounts current before Deutz would approve the sale to Diesel Power. The court entered judgment for Diesel Power for $809,396, and ADDCO appeals.

II.

The parties agree that Nebraska substantive law controls in this diversity case. Although the parties to a contract must intend to be bound by the contract, the requisite intent is not the parties' subjective intent, but is determined by the parties' objective manifestations of their intent to be bound by the agreement. See Viking Broad. Corp. v. Snell Publ. Co., 497 N.W.2d 383, 385-86 (Neb. 1993) (rejecting a line of cases holding that the parties' intent to be bound was a fact question; "intent in the realm of contract law is to be viewed objectively, not subjectively . . . ."). Because the Supreme Court of Nebraska views the existence of a contract as a matter of law, see Neb. Nutrients, Inc. v. Shepherd, 626 N.W.2d 472, 499 (Neb. 2001) (conducting de novo review of whether parties had a binding contract); Solar Motors, Inc. v. First Nat'l Bank of Chadron, 545 N.W.2d 714, 720-21 (Neb. 1996) ("The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below." (internal quotation marks omitted)), we review the district court's legal conclusion that a contract existed de novo, see BancInsure, Inc. v. BNC Nat'l Bank, N.A., 263 F.3d 766, 770 (8th Cir. 2001). We review the district court's factual findings for clear error. Id.

5

"[I]n order to establish an express contract [under Nebraska law,] there must be a definite proposal and an unconditional and absolute acceptance thereof." Viking Broad., 497 N.W.2d at 386. Further, there must be a meeting of the minds "at every point; nothing can be left open for future arrangement." Cimino v. FirsTier Bank, N.A., 530 N.W.2d 606, 614 (Neb. 1995). "A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement." Neb. Nutrients, Inc., 626 N.W.2d at 499. An informal agreement may be binding, despite the parties' intentions to enter a formal agreement at a later time, only if the later, formal agreement contains no new provisions not contained in or inferred from the prior informal agreement. Reynolds & Maginn v. Omaha Gen. Iron Works, 180 N.W. 584, 586 (Neb. 1920); Restatement (1st) of Contracts § 26 (1932).

The district court concluded that ADDCO and Diesel Power entered a binding verbal agreement on August 31, when Nicholson called Engler after meeting with him at the ADDCO facilities the day before. Under Nebraska law, the parties' agreement was not sufficiently definite as of August 31 to form a binding contract. Nicholson and Engler continued negotiations about the amount and timing of the goodwill payment at least up until execution of the September 11 Letter of Intent. Those negotiations did not include merely re-allocating the total price among various assets, but a real change in the timing of the goodwill payment, from an initial offer of $275,000 at closing or $100,000 at closing with $50,000 annual payments over five years, to $300,000 at closing and $25,000 annual payments over two years. Thus, the parties had not reached agreement on that vital term, as well as others, before September 11. See Sayer v. Bowley, 503 N.W.2d 166, 170 (Neb. 1993) ("[T]he conduct of the parties during the drafting of these [subsequent] documents indicates that several important terms had not been discussed or agreed upon at the time of the alleged oral agreement."). The district court erred in concluding that the August 30 and 31 negotiations formed a binding agreement.

The district court also determined that the parties were bound by the September 11 Letter of Intent. The Supreme Court of Nebraska quoted the Seventh Circuit in construing a Letter of Intent in Viking Broadcasting.

> We have a pattern common in commercial life. Two firms reach concord on the general terms of their transaction. They sign a document, captioned "agreement in principle" or "letter of intent," memorializing these terms but anticipating future negotiations and decisions–an appraisal of the assets, the clearing of a title, the list is endless. One of these terms proves divisive, and the deal collapses. The party that perceives itself the loser then claims that the preliminary document has legal force independent of the definitive contract.

Viking Broad., 497 N.W.2d at 385 (quoting Empro Mfg. Co. v. Ball-Co Mfg., Inc., 870 F.2d 423, 424 (7th Cir. 1989)). The letter of intent in Viking Broadcasting stated that any information gained during the due diligence investigation must be kept confidential "in the event the merger is not consummated," and provided that neither party would disclose the fact of the merger until the deal was consummated. Id. at 384. The court found that the letter of intent was so cursory, indefinite, and conditional that it failed as a matter of law to establish the parties' objective intent to be bound by it. Id. at 386.

Given the definiteness required under Nebraska law, we conclude that the September 11 Letter of Intent did not bind the parties. The parties continued to negotiate and prepare subsequent documents, including at least two versions of a draft Asset Purchase Agreement, neither of which was ever signed. The Supreme Court of Nebraska has looked at subsequent draft documents as a sign that the parties did not intend to be bound by an earlier document. See Hawkins Const. Co. v. Reiman Corp., 511 N.W.2d 113, 116-17 (Neb. 1994) (holding that parties did not enter a binding contract when a contractor accepted a subcontractor's bid where the parties continued to exchange draft agreements containing terms not previously addressed, such as liability insurance requirements, time for submitting shop drawings, billing

and payment terms, and who was responsible for a dewatering problem). The September 11 Letter of Intent contained language similar to that found in <u>Viking Broadcasting</u>, <u>see</u> 497 N.W.2d at 385, that revealed the tenuous nature of the negotiations when it stated that Diesel Power's "efforts <u>should we be successful in purchasing the NEG company</u> will [in] no way have a diliterious [sic] affect [sic] on [ADDCO's] reputation." (Appellant's App. at 92 (emphasis added).)

Despite the district court's conclusion that the September 11 Letter of Intent and the October 24 draft Purchase Agreement were identical in all material respects, our review reveals that there are material differences of substance between the documents. One material difference between the two documents is the total price. Diesel Power does not adequately address ADDCO's assertion that the October 24 draft Asset Purchase Agreement contemplated a total purchase price $57,000 less than the September 11 Letter of Intent. The reallocation of prices among the various assets cannot account for the significant difference in the total price. Additionally, the draft Asset Purchase Agreement detailed what was to be included in the purchase of the Deutz distributorship, including "job records, customer lists, vendor lists, outstanding purchase orders, project records, and supporting documents and quotation lists." (<u>Id.</u> at 125.) The Letter of Intent listed only Deutz inventory and engines. The detailed listing in the draft Asset Purchase Agreement reveals that the negotiations involved more than the mere transfer of physical assets. Diesel Power was attempting to purchase the whole of the NEG business, including the confidential records included in the draft Asset Purchase Agreement. These particulars are more than mere closing procedures.

A key material item included in the draft Asset Purchase Agreement not discussed in the Letter of Intent is the noncompete agreement. The parties had contemplated the existence of a noncompete provision as revealed in the August 24 letter. While the Letter of Intent made no reference to a noncompete agreement, the October 24 draft Asset Purchase Agreement valued it at $50,000, named the

individuals to whom it applied, two of whom were not signatories to any of the foregoing negotiations, and provided that the terms of the noncompete would be included as an attachment. Although the value assigned to the noncompete might have been a mere reallocation of the purchase price at ADDCO's request, the existence and the terms of the noncompete go well beyond a dollar amount. A noncompete agreement is a valuable tool used by parties in the purchase of a business to prevent the seller from competing against the purchaser. The temporal and geographic limitations are critical to both sides of the agreement, as revealed by the frequency with which we see them challenged in court. Although Diesel Power was attempting to buy an exclusive distributorship for Deutz engines, which presumably would hamper any attempts by the ADDCO principals to directly compete with Diesel Power without a Deutz distributorship, NEG did more than distribute Deutz engines. Noncompetes are generally much broader than a single brand of a product. Given the discussion of a noncompete in the August 24 letter, the absence of any mention of it in the September 11 Letter of Intent, and the reintroduction and valuation of it in the October 24 draft Asset Purchase Agreement, we cannot say that a noncompete agreement was immaterial to the transaction.

Both parties agree that the purchase was conditioned on Deutz's approval and transfer of the distributorship, yet the September 11 Letter of Intent did not mention the condition. Deutz conditionally approved the transfer on September 18, after the Letter of Intent was signed, and the October 24 draft Asset Purchase Agreement specifically provided that the transaction was contingent on the assignment of the distributor contract to Diesel Power and Deutz's approval of the assignment. We fail to see how the Letter of Intent can be said to include all of the material terms of the agreement when this very material term is not mentioned. Further, as the district court recognized when it adjusted the damage calculation by the $50,000 in dispute between ADDCO and Deutz, Deutz's approval was conditional and that condition had not been satisfied when ADDCO ended negotiations in late October.

9

One can easily sympathize with Diesel Power's plight. It spent nearly a year negotiating the purchase of NEG only to have its efforts come to naught when ADDCO was effectively wooed by another buyer willing to pay substantially more money. The continuing negotiations did not turn sour, which is generally what happens in cases involving letters of intent; rather, ADDCO just received a better offer. Diesel Power, as the drafter of the relevant documents, could have easily protected itself by including a good-faith or similar provision in the Letter of Intent that would have precluded ADDCO from entertaining other offers until the continuing negotiations between them broke down, and one party or the other formally withdrew from the Letter of Intent. But it did not. Given the particular definiteness required by Nebraska law, as demonstrated in <u>Viking Broadcasting</u>, we must reverse the district court's judgment.

III.

The district court's judgment awarding damages to Diesel Power on its breach-of-contract claim is reversed. The case is remanded to the district court with directions to enter judgment in favor of ADDCO on all of Diesel Power's claims. We decline to address those parts of ADDCO's appeal concerning the amount of the damages award as those issues are now moot.

_____