# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3063

_____

| | | |
|---|---|---|
| 168th and Dodge, LP, a Nebraska Limited Partnership, fka Brown Investment Partnership, LTD; Red Development of West Dodge, LLC, a Missouri Limited Liability Company, | * * * * * * | |
| Appellants, | * * | |
| v. | * * | Appeal from the United States District Court for the District of Nebraska. |
| Rave Reviews Cinemas, LLC, a Texas Limited Liability Corporation, | * * * | |
| Appellee. | * | |

_____

Submitted: June 13, 2007
Filed: August 31, 2007

_____

Before MELLOY, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

Red Development of West Dodge, LLC and 168th and Dodge, L.P (collectively "RED") filed suit against Rave Reviews Cinemas, LLC ("Rave") for breach of express contract, breach of implied contract, and promissory estoppel. Rave filed a motion to

dismiss RED's complaint. The district court[1] granted Rave's motion to dismiss with respect to the express contract claim but denied Rave's motion to dismiss with respect to the implied contract claim and the promissory estoppel claim. Thereafter, Rave filed a motion for summary judgment on the remaining claims. The district court[2] granted Rave's motion for summary judgment on the implied contract claim and promissory estoppel claim. RED appeals, arguing that the district court erred in granting Rave's motion to dismiss the express contract claim and in granting Rave's motion for summary judgment on the implied contract claim and the promissory estoppel claim. In addition, RED argues that the district court erred in affirming the clerk of the district court's taxation of costs. We affirm.

## I. *Background*

We recite the facts in the light most favorable to RED, the nonmoving party. *Ruminer v. Gen. Motors Corp.*, 483 F.3d 561, 562 (8th Cir. 2007).

RED is a commercial property development company. Rave owns and operates a chain of movie theaters. Previously, RED and Rave collaborated on the construction, operation, and lease of a theater project in Fort Wayne, Indiana, known as the Jefferson Pointe Project. In March 2002, RED submitted a request for plat approval to the Omaha City Planning Department to begin development of Village Pointe, an outdoor shopping center, located near 168th and Dodge Street in Omaha, Nebraska. The Omaha City Planning Board recommended conditional approval of the plat. At that time, the plat did not include plans for a movie theater complex.

---

[1]The Honorable Thomas M. Shanahan, United States District Judge for the District of Nebraska.

[2]Judge Shanahan was assigned to this case when it was filed and decided the motion to dismiss. Subsequently, the case was reassigned to the Honorable Joseph F. Bataillon, Chief Judge, United States District Court for the District of Nebraska.

-2-

In April 2002, Rave contacted RED about a proposal to build a theater complex at Village Pointe. Later that month, Tom Stephenson, President and Chief Executive Officer of Rave, and Bob Painter, Chief Operating Officer of Rave, traveled to Omaha to tour the site with RED representatives. From March through June 2002, RED and Rave exchanged plans and discussed the proposal to build the theater complex. On June 25, 2002, at Rave's request, RED sent Rave a site plan and proposal for Village Pointe, which included a movie theater complex.

In September 2002, RED revised and submitted to the Omaha City Planning Board a Village Pointe plat that included a movie theater complex. On September 18, 2002, RED bought an additional 14.67 acres of land to incorporate the movie theater complex into Village Pointe. The sales agreement provided that RED had a 90-day due diligence period to "inspect and review the Due Diligence items." Additionally, the agreement obligated RED to "obtain written evidence that the City of Omaha has adopted . . . a comprehensive zoning ordinance allowing the use of the Real Estate for retail purposes . . . and that the Real Estate has received final plat approval from the Omaha City Council . . . ."

On October 3, 2002, at Rave's request, RED faxed Rave the June 25, 2002 letter of intent. In a follow-up letter from Painter to RED dated October 29, 2002, Painter expressed his belief that Rave was "in agreement on most of all of the major issues" set forth in the June 25, 2002 term sheet. Painter concluded the letter by stating, "I look forward to moving on to the completion of the lease documentation, which we can then take to our Board for final discussion and approvals—which, as you know from Jefferson Pointe, is our final step in the approval process."

The principal dispute in this case is the meaning and effect of a five-page "Letter of Intent" dated November 13, 2002. RED sent the "Letter of Intent" to Rave detailing the proposed terms of a lease between the parties. On November 26, 2002,

the parties executed the letter of intent. The introductory paragraph provides as follows:

> The purpose of this letter is to express the intent of Lessor to earnestly investigate and work in good faith toward an agreement whereby the Lessor would lease to Lessee the property described herein upon the terms detailed below. Although this letter is binding on the parties as to terms herein detailed, should the transaction contemplated occur, this shall not be construed as either a lease agreement or an option to lease. Until a definitive agreement (the "Lease") is executed, this shall serve only to detail the terms and conditions which would control these parties in a subsequent agreement should one be executed. If the following terms and conditions are acceptable to the Lessee, please sign below indicating your agreement to the same. As soon as this Letter of Intent is fully executed by both parties, we will proceed to draw up the Lease in accordance with the Letter of Intent.

On November 26, 2002, Painter also sent a letter to Rehorn, a RED principal, which accompanied the signed letter of intent. The letter provided, in relevant part:

> I have also sent a copy [of the letter of intent] to [our attorney] and told him that we all agree that this lease should basically mirror the Jefferson Pointe lease and that he should expect some communications from Richard Katz to begin the drafting of the lease for Omaha as soon as possible.
>
> As I told you, it is my intent to get our presentation completed in the next few weeks so that we can get this deal in front of the Board by the end of the year, or early January, for their review and approval or comments.
>
> Early after the first of the new year [2003], I would want to get Terry Parish [Rave's Vice President of Construction] together with your construction people for a visit to the site and his preliminary prep work on his construction contract so that we are ready for a pad delivery date from you by late May and a construction start date by early June.

-4-

Following a public hearing on December 4, 2002, the Omaha City Planning Board recommended approval of RED's rezoning plan and revised plat, which included the movie theater complex. At a December 30, 2002 meeting between Rehorn and Stephenson, Rehorn, on behalf of RED, advised Stephenson of the approved plat. Rehorn also told Stephenson that RED was going to incur additional significant expenses to accommodate a Rave theater complex at Village Pointe. These expenses included purchase of the additional property and $594,616 for removal of a gas line. Stephenson, for Rave, replied to Rehorn that the Village Pointe project was a "done deal."

By mid-January 2003, the deal was not done—no written lease had been executed. RED pushed Rave to close the deal. When Rave asked about the urgency of signing the lease, RED indicated that its financing package depended on obtaining a signed lease with Rave. The parties continued negotiations in February and March 2003. During this time, RED began talks with Douglas Theaters as a possible replacement for Rave.

On March 22, 2003, Rave informed RED that it did not intend to build and lease a theater at Village Pointe and that Rave's board had rejected the agreement. In August 2003, RED entered into a contract with Douglas Theaters for construction of the movie theater complex. RED subsequently sued Rave alleging various contract theories. After the district court dismissed the various claims, the instant appeal ensued.

## II. *Discussion*

On appeal, RED asserts that the district court erred in: (1) granting Rave's motion to dismiss the express contract claim; (2) granting Rave summary judgment on the implied contract claim; (3) granting Rave summary judgment on the

promissory estoppel claim; and (4) affirming the clerk of the district court's taxation of costs.

## A. *Express Contract Claim*

First, RED argues that the district court erroneously dismissed RED's express contract claim because "the terms of the letter of intent were sufficiently definite to demonstrate an objective intent to be bound in contract." According to RED, the letter of intent bound Rave to the terms set forth in that letter. "[A]ny subsequent 'agreement' between the parties would represent nothing more than a mere formality." RED contends that subsequent actions by RED and Rave evince a clear intent to be bound by the terms of the letter of intent.

"We review the grant of a motion to dismiss de novo, taking all well pleaded factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007). The parties agree that Nebraska substantive law governs this diversity case. *See Diesel Power Equip., Inc. v. Addco, Inc.*, 377 F.3d 853, 856 (8th Cir. 2004). Nebraska courts consider whether a contract exists to be a question of law. *Id.* (citing *Neb. Nutrients, Inc. v. Shepherd*, 626 N.W.2d 472, 499 (Neb. 2001); *Solar Motors, Inc. v. First Nat'l Bank of Chadron*, 545 N.W.2d 714, 720–21 (Neb. 1996)).

Under Nebraska law, to recover for breach of express contract, "the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000). To establish an express contract under Nebraska law, a definite proposal and absolute and unconditional acceptance must exist. *Diesel*, 377 F.3d at 856 (citing *Viking Broad. Corp. v. Snell Publ'g Co.*, 497 N.W.2d 383, 385 (Neb. 1993)). Additionally, a "meeting of the minds" must occur at every point, with nothing left open for future agreement. *Id.* (citing *Cimino v. FirsTier Bank, N.A.*, 530 N.W.2d 606, 614 (Neb. 1995)). "'A contract is not formed if the

parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement.'" *Id.* (quoting *Neb. Nutrients, Inc.*, 626 N.W.2d at 499). "An informal agreement may be binding, despite the parties' intentions to enter a formal agreement at a later time, only if the later, formal agreement contains no new provisions not contained in or inferred from the prior informal agreement." *Id.* at 857 (citing *Reynolds & Maginn v. Omaha Gen. Iron Works*, 180 N.W. 584, 586 (Neb. 1920)).

We consider the *Viking Broad. Corp* case to be on point and controlling with respect to the existence of an express contract. In *Viking*, a Utah corporation filed an action to force a Nebraska corporation into a merger based on a letter of intent prepared by the Utah corporation and signed by both corporations. 497 N.W.2d at 383–84. In describing the "nature of the controversy" before it, the Nebraska Supreme Court quoted the Seventh Circuit, stating:

> "We have a pattern common in commercial life. Two firms reach concord on the general terms of their transaction. They sign a document, captioned 'agreement in principle' or 'letter of intent,' memorializing these terms but anticipating further negotiations and decisions—an appraisal of the assets, the clearing of a title, the list is endless. One of these terms proves decisive, and the deal collapses. The party that perceives itself the loser then claims that the preliminary document has legal force independent of the definitive contract."

*Id.* at 385 (quoting *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 424 (7th Cir. 1989)). According to the *Viking* court, the issue of whether a letter of intent constitutes an enforceable contract is one of law. *Id.* at 386. "In keeping with [its] rules that intent in the realm of contract law is to be viewed objectively, not subjectively, and that in order to establish an express contract there must be a definite proposal and an unconditional and absolute acceptance thereof," the court held that the letter of intent "was so cursory, indefinite, and conditional as to fail as a matter of

law to establish an objective intent on the part of the parties to be bound thereby." *Id.* (internal citations omitted). The court noted that the letter of intent—which involved a $14 million transaction:

> recite[d] in numbered paragraph 1 that it is with [the Nebraska corporation's] consent that an agreement and plan of merger would be entered into; it declare[d] in the same paragraph that certain [of the Nebraska corporation's] assets, only some of which [were] specified, would not be included in the transaction; and further, it acknowledge[d] in numbered paragraph 6 that the merger might not be consummated.

*Id.* Based on these findings, the court held that no factual issues existed, entitling the Nebraska corporation to judgment as a matter of law. *Id.*

In reaching its decision in *Viking*, the Nebraska Supreme Court extensively relied on the Seventh Circuit's *Empro* decision. In *Empro*, the prospective purchaser of a business's assets filed suit, contending that the letter of intent obligated the seller to sell only to the prospective purchaser. The purchaser sent the seller a three-page letter of intent to purchase the assets. 870 F.3d at 424. The letter of intent stated that "[t]he general terms and conditions of such proposal (which will be subject to and incorporated in a formal, definitive Asset Purchase Agreement signed by both parties)." *Id.* The letter of intent also stated that "'[the prospective purchaser's] purchase shall be subject to the satisfaction of certain conditions precedent to closing, including, but not limited to' the definitive Asset Purchase Agreement and, among five other conditions, '[t]he approval of the shareholders and board of directors of [the prospective purchaser].'" *Id.* The parties signed the letter of intent. *Id.* When the prospective purchaser learned that the seller was negotiating with another party, it filed suit, arguing that the letter of intent bound the seller. *Id.*

On appeal, the Seventh Circuit explained that "[p]arties may decide for themselves whether the results of preliminary negotiations bind them, but they do this

through words." *Id.* (internal citation omitted). In rejecting the prospective purchaser's argument, the court explained:

> A canvass of the terms of the letter [the prospective purchaser] sent does not assist it, however. "Subject to" a definitive agreement appears twice. The letter also recites, twice, that it contains the "general terms and conditions," implying that each side retained the right to make (and stand on) additional demands. [The prospective purchaser] insulated itself from binding effect by listing, among the conditions to which the deal was "subject," the "approval of the shareholders and board of directors of [the prospective purchaser]." The board could veto a deal negotiated by the firm's agents for a reason such as the belief that [the seller] had been offered too much (otherwise the officers, not the board, would be the firm's final decisionmakers, yet state law vests major decisions in the board). The shareholders could decline to give their assent for any reason (such as distrust of new business ventures) and could not even be required to look at the documents, let alone consider the merits of the deal.

*Id.* at 425. The court concluded that the prospective purchaser "made clear that it was free to walk." *Id.* at 425–26.

> Finally, the court commented on letters of intent generally, stating:

> Letters of intent and agreements in principle often, and here, do no more than set the stage for negotiations on details. Sometimes the details can be ironed out; sometimes they can't. Illinois . . . allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics. Approaching agreement by stages is a valuable method of doing business.

*Id.* at 426.

Here, the letter of intent expressly states that it "shall not be construed as either a lease agreement or an option to lease." The letter of intent was not definite, as it contemplates that a "definitive agreement" may be executed in the future. Furthermore, the letter was expressly conditional, as it stated that the terms and conditions detailed in the letter would control the parties "in a subsequent agreement should one be executed." This same language also indicates, as did the letter of intent in *Viking*, that an agreement might not be consummated at all. Also, as in *Empro*, Painter's letter accompanying the signed letter of intent indicated that board approval was necessary before Rave could enter a definitive agreement. In the absence of such a definitive lease agreement, no express contract exists.

## B. *Implied Contract Claim*

Second, RED asserts that the district court erroneously found that the statute of frauds bars its implied contract claim. According to RED, the Nebraska Statute of Frauds permits either a signed lease, notes, or memoranda signed by the party to be charged to satisfy the writing requirement. RED claims that numerous writings exist signed by Rave to satisfy this requirement.

This court reviews de novo a district court's grant of summary judgment. *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007). "Summary judgment is appropriate when the evidence and reasonable inferences, viewed in the light most favorable to the non-moving party, show no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id*.

An implied contract is one that "arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words. An implied contract arises where the intention of the parties is not expressed but where the circumstances are such as to show a mutual intent to contract." *Turner v. Fehrs Neb. Tractor & Equip. Co.*, 609 N.W.2d 652, 659 (Neb. 2000). "The determination of the parties' intent to make a contract is normally a question of fact.

-10-

Such intent is to be gathered from objective manifestations—the conduct of the parties, language used, or acts done by them, or other pertinent circumstances surrounding the transaction." *Kaiser v. Millard Lumber, Inc.*, 587 N.W.2d 875, 882 (Neb. 1999) (internal citation omitted). No implied contract can exist "where there is an express agreement between the parties relative to the same subject-matter." *Acton v. Schoenauer*, 236 N.W. 140, 141 (Neb. 1931) (holding that implied contract did not arise between father and daughter in care for father's wife because the evidence conclusively established that "there was a refusal to contract to pay for the services even on the part of the defendant's wife").

Section 36-105 of the Nebraska Revised Statutes provides that "[e]very contract for the leasing for a longer period than one year, or for the sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party whom the lease or sale is to be made." To satisfy § 36-105, the memorandum must (1) be "signed by the party to be charged or by his or her agent actually or apparently authorized to do so"; (2) state "each party to the contract either by his or her own name, or by such a description as will serve to identify him or her, or by the name or description of his or her agent"; (3) state "the land, goods or other subject matter to which the contract relates"; and (4) state "the terms and conditions of all promises constituting the contract and by whom and to whom the promises are made." *Pallas v. Black*, 414 N.W.2d 805, 809 (Neb. 1987) (internal quotations and citation omitted).

"The memorandum required by the statute of frauds must contain the essential terms of the contract." *Reifenrath v. Hansen*, 206 N.W.2d 42, 44 (Neb. 1973). Section 36-105:

> clearly contemplates that the . . . memorandum thereof in writing, shall contain within itself all of the essential elements which go to make up a contract, and, when essential elements of the contract are lacking, the contract must fail, because essential elements cannot be supplied by

parol testimony. The very purpose of the statute was to prevent such contracts from resting in parol.

*Kubicek v. Kubicek*, 186 N.W.2d 923, 926 (Neb. 1971).

Here, the subject of the purported implied contract is a 20-year lease for an interest in real estate. Without question, such a contract is subject to the statute of frauds. RED asserts that the series of writings that satisfy the statute of frauds are (1) the letter of intent; (2) the November 26, 2002 letter from Painter; and (3) correspondence from Rave's attorney to RED.

As we previously explained, the letter of intent is not an express contract, and neither can it support an implied contract. A contract cannot be implied if it is against the declaration of the party to be charged or against the intention of the parties. *See* 17 Am. Jur. 2d Contracts § 13 ("A contract cannot be implied in fact if it is against the declaration of the party to be charged or against the intention or understanding of the parties, if the evidence is inconsistent with its existence or if there is an express contract between the same parties that covers the same subject matter."). Here, the letter of intent explicitly states that no binding agreement exists until a definitive agreement is executed by the parties. Finding an implied contract in the present case would contradict the parties expressed intent as reflected in the plain language of the letter of intent. *See Budget Mktg., Inc. v. Centronics Corp.*, 927 F.2d 421, 426 (8th Cir. 1991) (stating that finding an implied duty "would contradict the express disclaimer of the letter of intent").

Likewise, Painter's letter dated November 26, 2002, does not satisfy the statute of frauds. Implying such a contract from the letter would be against Rave's intention or understanding and is thus prohibited. In the letter, Painter merely expressed his future intentions, stating that "*it is my intent* to get this presentation completed in the

-12-

next few weeks so that we can get this deal in front of the Board by the end of the year, or early January, for their review and approval or comments" and

> [e]arly after the first of the new year, I *would want* to get [Rave's Vice President of Construction] together with your construction people for a visit to the site and preliminary prep work so that we are ready for a pad delivery date from you by late May and a construction start date by early June.

(Emphasis added).

For support, RED relies on selected portions of the statement; however, we must read the statement in its entirety. RED notes Painter's statement that "we all agree that this lease should basically mirror the Jefferson Pointe lease." But the statement goes on to say that his attorney should merely "*expect* some communication from Richard Katz *to begin the drafting* of the lease for Omaha *as soon as possible*." (Emphasis added). The remainder of this statement illustrates the indefiniteness of Painter's understanding."[C]are should be taken not to attach promissory and contractual effect to what was at the time merely an expression of intention concerning future action." *Thomas v. Kearney Little League Baseball Ass'n*, 558 N.W.2d 842, 846 (Neb. App. 1997) (internal quotations and citation omitted).

Similarly, the correspondence from Rave's attorney, either alone or combined with the aforementioned writings, is insufficient to satisfy the statute of frauds. In the correspondence, Rave's attorney indicated that Rave needed to get the lease signed prior to their financing, which was to occur in January or February 2003. In addition, Rave's attorney informed RED that Rave wanted to "move quickly towards execution." Nothing in this correspondence deviates from the understanding expressed in the parties' letter of intent. The goal was to work towards a definitive lease agreement. The parties never reached that goal. On this record, RED cannot transform the parties' incomplete negotiations into a finished lease agreement.

Therefore, we hold that RED's implied contract claim fails as a matter of law, as no writing exists to satisfy the statute of frauds.

## C. *Promissory Estoppel Claim*

Third, RED argues that the district court erred in granting summary judgment to Rave on RED's promissory estoppel claim. Specifically, RED contends that the district court erroneously found, as a matter of law, that RED did not establish a promise upon which it could reasonably rely. RED asserts that whether a promise has been made or reasonably relied are questions of fact for a jury to decide. Moreover, RED contends that the district court also erroneously ruled that the statute of frauds bars RED's promissory estoppel claim.

The Nebraska Supreme Court defines "promissory estoppel" as:

"(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

*Yankton Prod. Credit Ass'n v. Larsen*, 365 N.W.2d 430, 433 (Neb. 1985) (quoting Restatement (Second) of Contracts § 90 at 242 (1981)).

Promissory estoppel requires evidence that the promisor made a "promise" to the promisee. A statement of opinion or future intent is insufficient to give rise to a promise. *Maxwell, Inc. v. Kenney Deans, Inc.*, No. A-98-930, 1999 WL 731846, at *5 (Neb. App. Sept. 21, 1999) (unpublished) (quoting 4 Richard A. Lord, Williston on Contracts, § 8:5 at 96 (4th ed.1992)); *see also City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468 (8th Cir. 2006) ("A supposed promise that is 'wholly illusory' or a mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance.") (internal quotations and citation omitted). In

addition, "'[p]romissory estoppel cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract.'" *Id.* at \*5 (quoting *Keil v. Glacier Park, Inc.*, 614 P.2d 502, 506 (1980)) (alteration in *Maxwell*).

Promissory estoppel also requires that the promisee's reliance on the promise be reasonable and foreseeable. *Rosnick v. Dinsmore*, 457 N.W.2d 793, 800 (Neb. 1990). For example, in *Abbound v. Michals*, 491 N.W.2d 34 (Neb. 1992), the court held that the plaintiffs' reliance on the defendant's oral representations was not reasonable because, as licensed real estate agents and brokers, the plaintiffs knew that contracts for commission must be in writing under state law. *Id.* at 42 (discussing reasonable reliance in a claim for fraudulent misrepresentation); *see also Weiner v. Hazer*, 430 N.W.2d 269, 272 (Neb. 1988) ("Weiner was a licensed real estate broker, charged with knowledge of § 36-107 concerning the necessity of a written contract for a specified real estate commission. Under the circumstances, Weiner could not in good faith rely on an oral contract for payment of a real estate commission to a broker.").

The statute of frauds may bar a plaintiff's claim for promissory estoppel. *See Farmland Serv. Coop, Inc. v. Klein*, 244 N.W.2d 86, 89 (Neb. 1976). In *Farmland*, the plaintiff sought damages for the defendants' breach of an oral agreement to sell 90,000 bushels of corn to the purchaser. *Id.* at 88. According to the plaintiff, the defendants knew that the plaintiff would rely on the defendants' agreement and immediately enter into resale agreements with other parties. *Id.* The defendants denied the existence of the contract and moved for summary judgment, arguing that because the alleged agreement was an oral agreement for the sale of goods above $500, the alleged contract was not enforceable under the statute of frauds. *Id.* The district court granted the motion for summary judgment, concluding that the plaintiff's action was barred by the statute of frauds. *Id.*

On appeal, the plaintiff argued that equity would not permit the defendants to use the statute of frauds as a shield for their wrongdoing. *Id.* at 89. To support this

-15-

argument, the plaintiff relied on *Hecht v. Marsh*, 181 N.W. 135 (Neb. 1920), in which the court stated:

> "Equity will not allow the statute of frauds to be used as an instrument of fraud, and will decree specific performance or hold the maker of a parol contract estopped from denying it when the other party, by virtue of it, and under and in pursuance of it, has so far acted as that it would be aiding in a fraud to permit the contract to be repudiated. And what equity would do our courts of law, under proper allegations, will also do."

*Id.* (quoting *Hecht*, 181 N.W. at 137 (internal quotations and citation omitted)). The *Farmland* court explained that, in *Hecht*, the seller of land refused to sign the contract until the buyer put up forfeit money as evidence of good faith. *Id.* "To induce the seller to waive the requirement, the broker orally agreed to waive his commission if the transaction was not completed. When the contract was not performed, the broker sued for his commission." *Id.* The court in *Hecht* held that equity would not permit the broker to use the statute of frauds as "an instrument of fraud." *Id.* Thus, the principle announced in *Hecht* was:

> Where a party to a written contract within the statute of frauds induces another to waive some provision upon which he is entitled to insist and thereby change his position to his disadvantage because of that party's inducement, the inducing party will be estopped to claim that such oral modification is invalid because not in writing.

*Id.* at 89–90. The *Farmland* court, however, determined that *Hecht* was inapplicable to the case before it, stating:

> It is clear to us that the mere breach or violation of an oral agreement which is specifically covered by the statute of frauds by one of the parties thereto or the mere denial of an agreement or refusal to perform it is not of itself a fraud either in equity or in law for which the court

should give relief. The mere pleading of reliance on the contract to his detriment should not be sufficient to permit a party to assert rights and defenses based on a contract barred by the statute of frauds. If he were permitted to do so, the statute of frauds would be rendered meaningless and nugatory. The mere failure to perform an oral contract within the statute where no relation of trust and confidence exists does not constitute fraud authorizing the right to relief. In *Hecht v. Marsh*, *supra*, the broker induced the seller to waive specific provisions of a written contract and his oral agreement to waive his fee. To have permitted the broker to have used the statute on his oral inducing agreement would have constituted a fraud on the seller.

*Id*. at 90. The court further explained that "promissory estoppel usually applies only in cases where there is a promise or representation as to an intended abandonment by the promisor of a legal right which he holds or will hold against the promisee," as was the situation in the *Hecht* case. *Id*. According to the court, such an interpretation "gives full effect to the statute of frauds rather than rendering it nugatory. . . ." *Id*.

In the present case, we conclude that no "promise" exists in the letter of intent upon which RED could rely because, as a matter of law in Nebraska, promissory estoppel cannot be based on the parties' agreement to negotiate the terms of the lease agreement.

In addition, even if we accepted RED's argument that Stephenson's comment that the lease agreement was a "done deal" qualifies as a sufficient promise, we would nevertheless hold, as a matter of law, that RED could not reasonably rely on such a promise. As in *Abbound*, both RED and Rave are sophisticated business entities charged with knowledge of the statutory requirement that contracts that cannot be completed within one year must be in a writing signed by the party to be charged. Because RED should know that a 20-year lease for an interest in real estate must be in writing, it cannot now argue that it reasonably relied on Stephenson's oral assurance that the lease agreement was a "done deal."

-17-

Furthermore, assuming that a promise existed and that RED reasonably relied on that promise, RED's promissory estoppel claim would still be barred by the statute of frauds. As in *Farmland*, nothing in the record indicates that Rave orally "induced" RED to waive a legal right that it held against Rave. Thus, Rave is not estopped from raising the defense of statute of frauds.

As previously explained, no writing satisfied the statute of frauds. Therefore, RED's promissory estoppel claim fails.

### D. *Taxation of Costs*

Finally, RED argues that the district court erred in upholding the taxation of costs as awarded by the clerk of the district court because the clerk erroneously allowed Rave to recover objectionable expenditures. These included such items as expedited transcripts, rough drafts of depositions, ASCII computer disks of depositions, copies of discovery depositions that Rave did not use in support of its motion for summary judgment, excessive airfare and hotel expenses for witnesses whom Rave did not depose, and other costs that are not recoverable. According to RED, the total amount of taxable costs must be reduced to $8,285.51.

We review the awarding of costs for abuse of discretion. *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 695 (8th Cir. 2001).

Federal Rule of Civil Procedure 54(d)(1) provides:

(d) Costs; Attorneys' Fees.

(1) Costs Other than Attorneys' Fees. Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the

extent permitted by law. Such costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

Section 1920 of 28 U.S.C. permits a judge or clerk of court to tax as costs "fees of the clerk and marshal, fees of the court reporter, fees and disbursements for printing and witnesses, fees for copies of necessary papers, docket fees, and compensation of court-appointed experts and interpreters." *Brisco-Wade v. Carnahan*, 297 F.3d 781, 782 (8th Cir. 2002). "[F]ederal courts are bound by the limitations set out in section 1920." *Id.* (internal quotations and citation omitted) (finding that the district court abused its discretion in taxing a mediator's fee against the defendant officials in a § 1983 action brought by a pro se prisoner because: (1) the Eastern District of Missouri Local Rules did not permit prisoner civil rights cases to be referred for mediation; (2) § 1920 did not list mediation fees as taxable costs; (3) while Rule 54(d) gave the district court discretion to award costs to the prevailing party, it gave the court no explicit authority to tax costs against the prevailing party).

"A prevailing party is presumptively entitled to recover all of its costs." *In re Derailment Cases*, 417 F.3d 840, 844 (8th Cir. 2005). The losing party bears the burden of overcoming the presumption that the prevailing party is entitled to costs, meaning that the losing party must "suggest a rationale under which the district court's actions constitute an abuse of discretion." *Janis v. Biesheuvel*, 428 F.3d 795, 801 (8th Cir. 2005).

The *Bill of Costs Handbook* for the District of Nebraska provides that, *inter alia,* the following are taxable: (1) fees of the court reporter for a deposition or trial "if the taking of the deposition was reasonably necessary at the time it was taken, even though it may not have been used at trial"; (2) fees for witnesses whose depositions are used at trial or in support of a motion; and (3) fees for service of summons and subpoena.

A review of Rave's index of evidence in support of its motion for summary judgment reveals that Rave did cite all of the challenged depositions in support of its summary judgment motion. Therefore, we hold that the district court did not abuse its discretion in approving the clerk of the district court's taxation of costs.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____