CASES DETERMINED

IN THE

# NEBRASKA COURT OF APPEALS

Fast Ball Sports, LLC, appellant and cross-appellee,
v. Metropolitan Entertainment & Convention
Authority, appellee and cross-appellant.
___ N.W.2d ___

Filed July 2, 2013.    No. A-12-425.

1. **Summary Judgment.** Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts, or as to the ultimate inferences that may be drawn from those facts, and that the moving party is entitled to judgment as a matter of law.
2. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.
3. **Contracts.** A claim that the parties created an enforceable contract generally presents an action at law.
4. **Judgments: Appeal and Error.** An appellate court reviews questions of law independently of the conclusion reached by the lower court.
5. **Breach of Contract: Proof.** To recover for breach of contract, a plaintiff must prove that a defendant made a promise, breached the promise, and caused the plaintiff damage and that any conditions precedent were satisfied.
6. **Contracts: Proof.** To establish an express contract, a party must prove a definite proposal and an unconditional and absolute acceptance of that proposal.
7. **Contracts: Words and Phrases.** An absolute proposal or offer is an expression of willingness to enter into an agreement with another, made in such a way that the other party is justified in believing that its acceptance is invited and will result in a contract.
8. **Contracts.** A communication intended only as preliminary negotiation or an expression of willingness to negotiate is not an offer.
9. ____. When a party subjects a contract to board approval, there is no contract or offer until the board approves.
10. **Contracts: Waiver.** In Nebraska, under the prevention doctrine, if a party prevents the occurrence of a condition necessary for the other party to perform an oral or written agreement, a court may waive the condition.
11. **Contracts.** The prevention doctrine does not apply to a condition precedent for the formation of a contract.

(1)

12. **Fraud.** The elements of fraud are (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that he or she suffered damage as a result.

13. ____. Fraud cannot ordinarily be predicated on unfulfilled promises or statements as to future events.

14. **Contracts: Fraud: Evidence.** If there is no signed contract, a party seeking to overcome the statute of frauds must proffer a writing, signed by the opposing party, detailing the terms and conditions of their promises. The writing can be any written evidence of an oral contract so long as the writing contains the essential terms of the contract.

15. ____: ____: ____. The written evidence necessary to overcome the statute of frauds does not need to be contained in a single document or communication, but if the terms of the contract can be collected from the correspondence of the parties, it will be a sufficient memorandum within the meaning of the statute of frauds.

16. **Contracts: Estoppel.** Under the doctrine of promissory estoppel, a court may enforce a promise made by a party if (1) that party should reasonably expect its promise to induce another party's action or forbearance, (2) its promise does induce action or forbearance, and (3) the only way to avoid injustice is to enforce the promise.

17. **Contracts: Fraud: Estoppel.** Promissory estoppel is not an exception to the statute of frauds; nor can it be used to circumvent the statute of frauds.

18. ____: ____: ____. Only where a party to a written contract within the statute of frauds induces another to waive some provision upon which he is entitled to insist and thereby change his position to his disadvantage because of that party's inducement will the inducing party be estopped to claim that such oral modification is invalid because not in writing.

19. **Equity: Contracts: Fraud: Partial Performance.** A court will enforce in equity an oral contract partly performed, even if the contract falls within the statute of frauds.

20. **Contracts: Fraud: Partial Performance.** The justification of the partial performance exception to the statute of frauds is that partial performance is good evidence for believing an agreement exists.

21. **Contracts: Fraud.** Ordinary business preparations are not sufficient to remove an alleged contract from the statute of frauds.

22. **Contracts: Partial Performance.** Preliminary acts or mere preparations to act do not constitute partial performance.

23. **Trial: Appeal and Error.** An appellate court reviews a trial court's determination of a request for sanctions for abuse of discretion.

24. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Jason M. Bruno, of Sherrets, Bruno & Vogt, L.L.C., for appellant.

Mark C. Laughlin and Ryan M. Sewell, of Fraser Stryker, P.C., L.L.O., for appellee.

Sievers and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION
Fast Ball Sports, LLC (FBS), appeals an order of the district court for Douglas County denying it summary judgment and granting summary judgment in favor of Metropolitan Entertainment & Convention Authority (MECA). MECA cross-appeals the trial court's denial of dismissal of the suit as a sanction. The trial court found that MECA and FBS did not form a contract and that FBS was not entitled to remedies under theories of promissory estoppel or fraud. We agree. We further determine that the trial court did not abuse its discretion in denying the requested sanction and affirm its ruling.

## II. BACKGROUND
FBS is a corporation that sought to acquire a professional baseball franchise to play baseball in Omaha, Nebraska, at TD Ameritrade Park. MECA is a nonprofit group that manages and operates TD Ameritrade Park.

MECA and FBS began negotiating in August 2009 with the help of a consulting group, the Pierce Group, which acted as a "go between." In November, Roger Dixon, MECA's chief executive officer, prepared and sent a cover letter and attached "Memorandum of Understanding" (MOU) to the Pierce Group and to FBS' chief executive officer. The cover letter explained that the MOU provides "principal terms" that would be used to prepare a "definitive Lease" if agreed to by both parties. The cover letter stated that any lease agreement must be "submitted for approval to the MECA Board and thereafter mutually executed." Both parties agreed

that the letter and the MOU provided the framework for the negotiations.

The parties did not have contact again until May 2010, when FBS requested to meet with Dixon to continue negotiations. Dixon responded that MECA was involved in negotiations with another group and would resume discussions with FBS if those other negotiations failed.

In August 2010, MECA and FBS resumed discussions. At that time, Dixon advised FBS in writing that MECA would make one last attempt at negotiating a lease, but that it needed more information about the individuals in FBS' ownership group and FBS' available financial resources.

On August 19, 2010, MECA's chief financial officer, Lea French, prepared a draft lease, which the parties revised on two occasions. On September 17, MECA's attorney e-mailed FBS' attorney asking for additional information about the "Northern League" to provide to MECA's board of directors (MECA Board) in his confidential report. In his e-mail, he mentioned he would be attending a MECA Board meeting that evening but did not yet have all the information he needed to provide to the MECA Board.

On September 20, 2010, French e-mailed a revised draft lease dated September 17, 2010, to MECA and FBS representatives. As with the previous drafts, she labeled the document as a "[d]raft" and included blue editing marks. In her e-mail, she identified the draft lease as a "redline" version. The draft lease stated that MECA would lease the TD Ameritrade Park stadium to FBS for a term of approximately 5 years for the purpose of "presenting Northern League baseball games." It also contained a strict compliance clause.

Also on September 20, 2010, at the Pierce Group's request, French wrote a letter to the commissioner of the Northern League to help FBS obtain a franchise. The letter states:

[MECA] has reached agreement with [FBS] on the major terms of a lease agreement to play Northern League baseball at the TD Ameritrade Park Omaha stadium. [FBS] was provided with a draft agreement and MECA has not received any material comments to that draft. MECA

plans to have the final agreement approved at the October 14, 2010 meeting of the MECA Board . . . .

We ask that you swiftly formalize your approval and issuance of a franchise to [FBS] so that we may finalize the lease agreement.

French sent copies of the letter to MECA and FBS representatives. In response, the Northern League awarded FBS a franchise, and FBS paid a franchise fee of $200,000 and an application fee of $10,000 and committed to paying a total of $1,010,000.

During the fall of 2010, Dixon learned from outside sources that FBS' management had changed, and based upon information from outside sources, he became concerned about the Northern League's future viability. As a result, Dixon decided not to present the proposed lease agreement to the MECA Board and no lease agreement was ever signed by both parties. The Northern League ceased operations in 2010, and one Northern League team joined the North American Baseball League. While many of the teams in the Northern League were located in the Midwest, the teams in the North American Baseball League were located much farther away from Omaha, in places such as Hawaii and Canada.

In December 2010, the chairman of the MECA Board advised FBS in writing that the MECA Board would not consider FBS' proposal. His reasoning was that FBS had represented in September that the Northern League was a solid eight-team league, but that within a few days of that representation, MECA learned from other sources that this was no longer the case.

The parties dispute whether or not certain oral statements were made during the course of negotiations. In particular, FBS asserts that during the negotiations, MECA represented that the parties had a "done deal," that Dixon had authority to bind MECA to a lease agreement, that the MECA Board would approve any agreement presented to it by Dixon, and that if FBS obtained an independent baseball franchise, the lease would be signed and approved no later than October 14, 2010. MECA denies making such representations.

In February 2011, FBS filed a complaint in the district court for Douglas County. FBS attached a purported copy of the September 17, 2010, lease agreement to its complaint. This attachment, however, was not the copy of the lease MECA sent FBS. The version attached to the complaint did not contain the blue editing marks or the word "draft" in the upper right-hand corner. Furthermore, it was initialed and signed by FBS representative Nick Grammas.

MECA moved for sanctions, including that the trial court dismiss the case with prejudice because FBS intentionally misled the trial court by attaching an altered and executed version of the draft lease. At the hearing, FBS admitted that it altered the lease, but argued that it did not intend to mislead the trial court, offering its admission at the hearing as proof. The trial court denied MECA's motion for sanctions.

Pursuant to rulings on motions to dismiss, FBS amended its complaint twice. In the second amended complaint, FBS sought remedies based on theories of breach of contract, fraud, and promissory estoppel. Both parties subsequently filed motions for summary judgment.

The court granted MECA's motion for summary judgment and denied that of FBS. The court found no valid contract existed between the parties. It explained that the MECA Board's approval was a condition precedent to the formation of a valid contract and that the evidence did not show the MECA Board approved the contract. The court further found that the statute of frauds barred consideration of any oral statements made between the parties, and it denied FBS' fraud and promissory estoppel claims.

This timely appeal followed.

### III. ASSIGNMENTS OF ERROR

FBS assigns that the trial court erred in (1) denying its motion for summary judgment and (2) granting MECA's motion for summary judgment. MECA assigns on cross-appeal that the trial court erred in denying its request for dismissal of the suit as a sanction.

## IV. STANDARD OF REVIEW

[1] Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts, or as to the ultimate inferences that may be drawn from those facts, and that the moving party is entitled to judgment as a matter of law. *Mortgage Express v. Tudor Ins. Co.*, 278 Neb. 449, 771 N.W.2d 137 (2009).

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Wise v. Omaha Public Schools*, 271 Neb. 635, 714 N.W.2d 19 (2006).

[3,4] A claim that the parties created an enforceable contract generally presents an action at law. *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011). An appellate court reviews questions of law independently of the conclusion reached by the lower court. See *id*.

## V. ANALYSIS

### 1. FBS MOTION FOR
### SUMMARY JUDGMENT

FBS argues that the trial court erred in denying its motion for summary judgment. FBS moved for summary judgment on theories of breach of contract, fraud, and promissory estoppel. The trial court found that FBS was not entitled to summary judgment on any of its claims. We agree.

#### (a) Breach of Contract Claims

FBS contends that MECA and FBS entered into a legally enforceable lease agreement because Dixon and FBS agreed to all material terms and the MECA Board's approval was not required. Because MECA and FBS did not form a contract, the trial court correctly denied FBS relief for its first three claims.

[5,6] To recover for breach of contract, a plaintiff must prove that a defendant made a promise, breached the promise,

and caused the plaintiff damage and that any conditions precedent were satisfied. See *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000). A contract may be express, implied, written, or oral. To establish an express contract, a party must prove a "definite proposal and an unconditional and absolute acceptance" of that proposal. *Viking Broadcasting Corp. v. Snell Publishing Co.*, 243 Neb. 92, 97, 497 N.W.2d 383, 386 (1993).

### (i) Legally Enforceable Contract

[7-9] To find an express contract, we must find writings that prove there was an absolute proposal and unconditional acceptance. An absolute proposal or offer is an expression of willingness to enter into an agreement with another, made in such a way that the other party is justified in believing that its acceptance is invited and will result in a contract. The offeror is the master of the offer. See *Keller v. Bones*, 260 Neb. 202, 615 N.W.2d 883 (2000). A communication intended only as preliminary negotiation or an expression of willingness to negotiate is not an offer. See Restatement (Second) of Contracts § 26 (1981). When a party subjects a contract to board approval, there is no contract or offer until the board approves. See, *Pluhacek v. Nebraska Lutheran Outdoor Ministries*, 227 Neb. 778, 420 N.W.2d 286 (1988); Restatement (Second), *supra*.

In this case, MECA advised FBS at the outset of negotiations in the MOU and its cover letter that any lease must be approved by the MECA Board before being executed. Both parties agreed that the letter and the MOU provided the framework for the negotiations. The parties do not dispute that the MECA Board never approved the September 17, 2010, draft lease or any other lease.

In *Pluhacek, supra*, the Nebraska Supreme Court found that an agreement which contained a provision which subjected acceptance to full board approval did not constitute a contract without board approval, even though it was fully executed. In the present action, the draft lease contains less evidence of a contract than the executed agreement in *Pluhacek* because MECA did not execute the draft lease. Because the MECA

Board never approved the lease agreement, the parties never entered into a binding agreement.

### (ii) Doctrine of Prevention

FBS argues that lack of the MECA Board's approval cannot be used to defeat the finding of an express contract because MECA waived the condition under the doctrine of prevention when it failed to present the lease to the board. This argument misapplies the prevention doctrine.

[10,11] In Nebraska, under the prevention doctrine, if a party prevents the occurrence of a condition necessary for the other party to perform an oral or written agreement, a court may waive the condition. But the prevention doctrine does not apply to a condition precedent for the formation of a contract. See *D & S Realty v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1 (2012) (wherein court cites to 13 Samuel Williston, A Treatise on the Law of Contracts § 39:1 at 509 (Richard A. Lord ed., 4th ed. 2000), which explains that prevention doctrine applies "where parties capable of contracting have deliberately entered into a written contract by which there is created a condition precedent to a right to performance").

In this case, the condition precedent of the MECA Board's approval was a step required to form an agreement between the parties rather than a condition to performance in an already existing contract. Because the parties did not have an agreement, Dixon was not obligated to present the potential agreement to the MECA Board and did not waive the condition by choosing not to do so. See *168th and Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945 (8th Cir. 2007) (holding that where terms are subject to board approval, board is free to withhold consent or refuse to consider terms negotiated by its officers). In December 2010, the MECA Board rejected FBS' offer to present the potential agreement based on the information it had received from Dixon regarding the instability of FBS and the Northern League. The MECA Board was within its rights to do so.

FBS argues that the failure to present the proposal constituted a breach of the duty of good faith and fair dealing. FBS, however, did not produce any evidence suggesting that

MECA did not negotiate in good faith. See *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 468 N.W.2d 350 (1991). The only evidence produced showed that Dixon had concerns about FBS' ownership, its financial stability, and the long-term viability of the Northern League. For that reason, Dixon decided not to present the draft lease to the MECA Board. FBS' argument that MECA breached the duty of good faith and fair dealing is without merit.

### (b) Fraud

In the alternative, FBS argues that it is entitled to summary judgment because MECA made false misrepresentations upon which FBS relied. FBS claims that MECA fraudulently represented that the two parties agreed on the terms of a lease, that MECA would honor the lease, and that MECA would enter into a lease agreement with FBS if FBS acquired a professional baseball franchise. FBS argues that its reliance on these fraudulent statements caused it to suffer damages. We disagree.

[12] The elements of fraud are

> (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that he or she suffered damage as a result.

*Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 747, 626 N.W.2d 472, 495 (2001), *abrogated on other grounds, Sutton v. Killham*, 285 Neb. 1, 825 N.W.2d 188 (2013).

[13] A fraudulent statement relates to a "'present or preexisting fact.'" *Linch v. Carlson*, 156 Neb. 308, 316, 56 N.W.2d 101, 105 (1952). Fraud "'cannot ordinarily be predicated on unfulfilled promises, or statements as to future events.'" *Id*.

The MECA representatives deny having made the representations that FBS attributes to them; however, on review of a summary judgment, an appellate court reviews the evidence in a light most favorable to the party against whom judgment

was entered. We therefore address FBS' claim of fraud as though the alleged statements were made.

FBS contends that MECA represented to it that (1) MECA would enter into a lease agreement if FBS obtained a professional baseball franchise; (2) the parties had reached an agreement on all material terms; (3) MECA intended to honor the lease agreement beginning in 2011; (4) the lease agreement would be presented to the MECA Board for approval at its October 14, 2010, meeting; and (5) MECA and FBS "had a deal."

The second of the foregoing contentions is not a fraudulent statement. MECA does not deny that it had reached an agreement with FBS on all material terms; however, this does not create a binding agreement, because of the condition precedent of board approval as discussed above. The first, third, and fourth contentions are statements of unfulfilled promises or future events and therefore are not subject to a finding of fraud. As to the fifth contention, we find FBS could not have reasonably relied upon it for two reasons. First, MECA made known to FBS from the outset of negotiations that board approval was necessary. FBS does not allege that MECA ever represented to it that the lease was board approved or that board approval was not necessary. Grammas conceded that he could not have reasonably relied upon Dixon's "we ha[ve] a deal" statement when Grammas stated in his deposition that although as a businessman, he may believe someone's statement "'You got a deal,'" to have a legally enforceable agreement, "you got to see the paper." In *168th and Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945, 957 (8th Cir. 2007), the court, applying Nebraska law, held that sophisticated business entities could not reasonably rely upon a statement that an agreement was a "'done deal'" without execution of the required written agreement. Therefore, we find that the trial court properly rejected FBS' claim of fraud.

Furthermore, the statute of frauds prevents an oral agreement in these circumstances. FBS claims the parties agreed to a minimum 5-year lease of the TD Ameritrade Park stadium. Nebraska's statute of frauds states: "Every contract for the leasing for a longer period than one year, or for the

sale of any lands, shall be void unless the contract or some note or memorandum thereof be in writing and signed by the party whom the lease or sale is to be made." Neb. Rev. Stat. § 36-105 (Reissue 2008).

[14,15] If there is no signed contract, a party seeking to overcome the statute of frauds must proffer a writing, signed by the opposing party, detailing the terms and conditions of their promises. *Hansen v. Hill*, 215 Neb. 573, 340 N.W.2d 8 (1983). The writing can be any written evidence of an oral contract so long as the writing contains the essential terms of the contract. See *David v. Tucker*, 196 Neb. 575, 244 N.W.2d 197 (1976). The written evidence does not need to be contained in a single document or communication, but "[i]f the terms of the contract can be collected from the correspondence of the parties . . . it will be a sufficient memorandum within the meaning of the statute of frauds." *Collyer v. Davis*, 72 Neb. 887, 893, 101 N.W. 1001, 1003 (1904). Accord *Fowler Elevator Co. v. Cottrell*, 38 Neb. 512, 57 N.W. 19 (1893).

In this case, there is no memorandum or writing that meets the requirements of the statute of frauds. The cover letter to the MOU specifically stated that the MOU was nonbinding and subject to the MECA Board's approval. The September 17, 2010, draft lease identifies itself as a draft, contains blue editing marks, and is not signed by MECA.

As pointed out by FBS, both parties were represented by legal counsel throughout the negotiations. Furthermore, the parties were sophisticated businesspersons. Sophisticated business entities are charged with knowledge of the statute of frauds and cannot reasonably rely on oral statements. See *168th and Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945 (8th Cir. 2007). In *168th and Dodge, LP*, the Eighth Circuit, interpreting Nebraska law, found as a matter of law that because one party should have known that a lease for an interest in real estate must be in writing, it could not have reasonably relied on the other party's oral statement that the lease agreement was a "'done deal.'" 501 F.3d at 957.

We therefore find that the trial court was correct in denying summary judgment on FBS' fraudulent representation claim.

### (c) Promissory Estoppel

FBS argues that in the alternative to breach of contract, it is entitled to damages on grounds of promissory estoppel because MECA induced it to suffer damages. FBS relies upon French's September 20, 2010, letter to the commissioner of the Northern League in which she requests issuance of a franchise to FBS. It claims that as a result of the letter, the Northern League issued a franchise to FBS which cost FBS $210,000 and a future commitment of $800,000. It claims on appeal that it was entitled to summary judgment for reimbursement of the $210,000 it paid for the franchise. We disagree.

[16] Under the doctrine of promissory estoppel, a court may enforce a promise made by a party if (1) that party should reasonably expect its promise to induce another party's action or forbearance, (2) its promise does induce action or forbearance, and (3) the only way to avoid injustice is to enforce the promise. See *Rosnick v. Dinsmore*, 235 Neb. 738, 457 N.W.2d 793 (1990).

To succeed under its promissory estoppel claim, FBS must prove that it paid $210,000 as a result of a promise made by MECA. FBS relies heavily upon French's September 20, 2010, letter to the commissioner of the Northern League which states that "MECA plans to have the final agreement approved at the October 14, 2010 meeting of the MECA Board." The letter contains no promise that the MECA Board will approve the lease, a condition precedent to any binding contract between the parties. Even considering the oral statements attributed to the individual MECA employees, none of those statements indicated that the MECA Board's approval was received or had become unnecessary. Since no promise was made regarding board approval, we find that FBS failed to prove the threshold element of promissory estoppel.

Furthermore, there is nothing in the record to prove that French should have reasonably expected FBS to make an immediate payment for the franchise. She testified in her deposition that she did not know a franchise fee was required. Dixon testified that he assumed FBS would have to pay a franchise fee, but there is nothing to indicate when that fee was due. Of the $210,000 that FBS claims as damages, the

record indicates that $10,000 was a nonrefundable application fee which FBS paid *prior* to the date of French's letter; therefore, French's letter could not have induced this payment. The evidence further reveals a draft in the amount of $198,000 dated September 16, 2010 (4 days prior to French's letter), which Grammas identified as a copy of the check paid to the Northern League for the franchise. The record indicates that a franchise agreement was entered into on September 29 and that FBS immediately paid a deposit of $200,000. There is no evidence that anyone from MECA should have reasonably expected FBS to make such a payment prior to the MECA Board's approving the lease, because board approval was a condition precedent from the outset of the parties' negotiations.

[17,18] In addition, as stated above, the statute of frauds is applicable to the alleged agreement because it involves a lease greater than 1 year. Promissory estoppel is not an exception to the statute of frauds. See *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 244 N.W.2d 86 (1976). Only

> [w]here a party to a written contract within the statute of frauds induces another to waive some provision upon which he is entitled to insist and thereby change his position to his disadvantage because of that party's inducement [will] the inducing party . . . be estopped to claim that such oral modification is invalid because not in writing.

See *id*. at 543, 244 N.W.2d at 89-90. Promissory estoppel cannot be used to circumvent the statute of frauds. *Rosnick, supra*.

FBS seeks alternative damages based on MECA's alleged failure to fulfill an obligation that is covered by the statute of frauds by artfully pleading promissory estoppel. Because the statute of frauds applies, we find that the trial court properly denied FBS' promissory estoppel claim.

## 2. MECA's Motion for Summary Judgment

FBS alleges that the trial court should not have granted MECA's motion for summary judgment. FBS argues that the

statute of frauds is inapplicable because the parties set forth their initial agreement in writing, FBS partially performed under the agreement, and the statute of frauds does not apply to claims of fraud and promissory estoppel.

Our discussion above regarding the insufficiency of the writings upon which FBS relies and its claims of fraud and promissory estoppel adequately addresses FBS' argument as to these claims, and we find that the trial court did not err in its determination that the statute of frauds was applicable on these bases. Therefore, we will address only FBS' claim that partial performance removes this case from the statute of frauds.

[19] A court will enforce in equity an oral contract partly performed, even if the contract falls within the statute of frauds. See *Campbell v. Kewanee Finance Co.*, 133 Neb. 887, 277 N.W. 593 (1938).

[20-22] The justification of the partial performance exception to the statute of frauds is that partial performance is good evidence for believing an agreement exists. Howard O. Hunter, Modern Law of Contracts § 7:36 (2012). Ordinary business preparations, however, are not sufficient to remove an alleged contract from the statute of frauds. *Id*. Preliminary acts or mere preparations to act do not constitute partial performance. *F.D.I.C. v. Altholtz*, 4 F. Supp. 2d 80 (D. Conn. 1998). See *Heine v. Fleischer*, 184 Neb. 379, 167 N.W.2d 572 (1969).

In *Heine*, the Nebraska Supreme Court found that paying the entire consideration for the purchase of realty was not sufficient partial performance to prevent application of the statute of frauds. Similarly, in *168th and Dodge, LP v. Rave Reviews Cinemas, LLC*, 501 F.3d 945 (8th Cir. 2007), the court found that plaintiffs who spent approximately $600,000 to purchase additional land and remove a gasline to ensure the land was ready for the impending lease agreement had not partially performed the contract.

In this case, FBS argues that it partially performed the contract by taking steps to hire staff, develop a marketing scheme, and acquire a baseball franchise. FBS alleges that it spent $210,000 acquiring a franchise and other sums to pay

the salaries of staff hired to work on promoting the baseball team. But FBS did not actually perform any part of the contract through these actions.

These actions were similar to the actions of the plaintiffs in *168th and Dodge, LP, supra*, in that while the actions were substantial, they were necessary before the plaintiffs could begin performing the contract. In this case, FBS needed to acquire a franchise and create a marketing plan before it could play professional baseball in the TD Ameritrade Park stadium, which was the purpose of the proposed lease. Preparations do not constitute sufficient performance to remove the contract from the statute of frauds.

Because the parties had no express contract and the statute of frauds applies to FBS' claims of fraud and promissory estoppel, we affirm the trial court's order granting summary judgment in favor of MECA.

### 3. Denial of Dismissal
#### as Sanction

MECA cross-appeals the trial court's denial of sanctions against FBS. MECA argues that the trial court should have used its inherent power to sanction FBS by dismissing its complaint because FBS materially altered evidence and attached it to its original complaint in a misleading way.

The record reveals that FBS attached to its original complaint an altered piece of documentary evidence purporting to be a lease to which the parties agreed. We note that counsel for FBS concedes he removed language indicating this was a draft, added the signature of FBS, and added initials of FBS' representative on each page. MECA moved for sanctions, including requesting that the trial court dismiss FBS' complaint with prejudice or stay discovery until the altered lease was explained. FBS filed a motion to strike MECA's motion for sanctions claiming that "[t]here has been absolutely no tampering, misrepresentations, or underhandedness of any kind and [MECA's] Motion is a red hearing [sic] intended to mislead the Court." Despite this accusation, FBS admitted to the alterations set forth above of "the removal of 'draft' from the upper right

hand corner, the signature of [FBS], and the initials of [FBS']
representative on each page."

At the hearing on the motion for sanctions, FBS' counsel
confessed that one of his colleagues or FBS itself altered the
document he attached to the complaint. However, he stated that
the act was not "dishonest." The court addressed the serious-
ness of counsel's actions in the following exchange:

> THE COURT: The problem that I have is in paragraph
> 13 of the complaint, it says the agreement was memo-
> rialized in writing within a stadium lease agreement
> prepared by MECCA [sic] and its attorneys. In that case
> that is an agreement and is something that they sent to
> you. Then you say a copy of the stadium lease agreement
> signed by FBS is attached there to [sic] as Exhibit A,
> inferring Exhibit A is the same item as the stadium lease
> agreement allegedly sent. If you wanted to modify if [sic]
> and say sent [sic] a copy of the stadium lease agreement
> signed by FBS is attached to Exhibit A, wouldn't that
> solve it?
>
> [Counsel for FBS]: It would solve it.
>
> THE COURT: You don't think that's misleading?
>
> [Counsel for FBS]: I don't think so.
>
> . . . .
>
> [Counsel for FBS]: We weren't trying to be misleading.
>
> THE COURT: But it is. I don't think there's any
> question.

FBS' counsel then orally moved to file an amended com-
plaint without the altered document attached. The trial court
denied sanctions and granted leave to file the amended
complaint.

In addition, FBS' counsel also confesses to sending a let-
ter via e-mail to Omaha's mayor encouraging him to persuade
MECA to honor the purported lease agreement. In support,
counsel attached a copy of the complaint containing the lease
with the deletions and alterations confessed above. Counsel
represented to the mayor that the attached lease was a "true and
correct" copy of the lease.

[23] We review a trial court's determination of a request for sanctions for abuse of discretion. See *Paro v. Farm & Ranch Fertilizer*, 243 Neb. 390, 499 N.W.2d 535 (1993). We note that typically, a request for sanctions arises under Neb. Ct. R. Disc. § 6-337 for violation of a court order involving discovery. In the present case, MECA requested sanctions for violation of the very foundation upon which the practice of law is built—integrity. While our court rules do not contain a specific provision imposing sanctions upon one who violates his duties as an officer of the court, such violation is no less sanctionable than violation of a discovery rule, and the courts have inherent power to impose such sanctions. In the past, this level of misconduct may have subjected the offender to the old English common law rule requiring attorneys who deceived the court to be imprisoned for a day and a year. See, West. 1, 3 Edw. I, ch. 29 (1275); Alex B. Long, *Attorney Deceit Statutes: Promoting Professionalism Through Criminal Prosecutions and Treble Damages*, 44 U.C. Davis L. Rev. 413 (2010). But, we review a trial court's order on sanctions for an abuse of discretion, and we find that the trial court did not abuse its discretion in denying MECA's requested sanction of dismissal with prejudice.

[24] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Cole v. Isherwood*, 271 Neb. 684, 716 N.W.2d 36 (2006). Applying this definition, we find that although the granting of such a sanction would have been within the trial court's discretion, its refusal to do so was not untenable; nor did it deprive MECA of a substantial right or just result. FBS omitted the altered lease when it filed its amended complaint, removing the false impression that MECA had provided a final copy for FBS' consideration. The case then proceeded without the false representation that MECA had submitted a final lease to FBS for consideration. Therefore, MECA was not deprived of a substantial right or just result. We further note that dismissing FBS' complaint

would have punished the client rather than its attorney, and the record contains no indication that FBS was aware of its counsel's actions.

This is not to say that we condone counsel's actions or that we adhere to a principle of "no harm, no foul" in a situation such as this. To the contrary, we find FBS' counsel's conduct highly offensive for an officer of the court. But our standard of review dictates this outcome, and it is not the function of an appellate court to become investigators and truth finders on issues not before it. Any potential discipline is not within our realm, but, rather, within that of the Counsel of Discipline, if appropriate. See, e.g., *State ex rel. Counsel for Dis. v. Riskowski*, 272 Neb. 781, 724 N.W.2d 813 (2006); *State ex rel. Counsel for Dis. v. Mills*, 267 Neb. 57, 671 N.W.2d 765 (2003). Thus, our finding of no abuse of discretion by the trial court in denying the particular sanction sought should not be taken for anything more than exactly that.

## VI. CONCLUSION

Viewing the evidence in a light most favorable to FBS, and giving it the benefit of all reasonable inferences deducible from the evidence, we find that the trial court did not err in denying FBS' motion for summary judgment or in granting MECA's motion for summary judgment. While we do not condone the actions of FBS' counsel, we do not find that the trial court abused its discretion in refusing to dismiss FBS' complaint with prejudice. Therefore, we affirm the trial court's order in all respects.

AFFIRMED.

IRWIN, Judge, participating via the Internet.